Filed 3/1/22  In re A.G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | |
| | D079606 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. J520082) |
| Plaintiff and Respondent, | |
| v. | |
| D.G., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Rohanee Zapanta, Judge.  Reversed and remanded.

Elena S. Min, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

D.G. (Mother) appeals from the juvenile court's order terminating her parental rights to her daughter at the hearing pursuant to Welfare and Institutions Code section 366.26.[1] She contends the court applied an incorrect legal standard in determining the parental-benefit exception to adoption did not apply. Specifically, she contends the court improperly focused on whether Mother held a parental role and had overcome the protective issues that led to dependency, factors which have been disapproved by the California Supreme Court in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). Mother also contends reversal is required because the San Diego County Health and Human Services Agency (Agency) failed to comply with the inquiry requirements under the Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.)

On the record before us, we are unable to conclude that the juvenile court applied the correct legal standard in determining the parental-benefit exception did not apply. Accordingly, we are compelled to reverse the order terminating Mother's parental rights and remand the matter for further proceedings consistent with *Caden C.* Because we also conclude the Agency has failed to comply with ICWA, we remand for the Agency to conduct further inquiry consistent with ICWA.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Proceedings Before Contested Section 366.26 Hearing*

A.G. was born to Mother and R.G. (Father)[2] and came to the attention of the Agency on at least four separate occasions before her second birthday.[3] In July 2019, the Agency was contacted after the police served a search warrant on the parents' home and found methamphetamine, marijuana, drug paraphernalia, and a loaded .32 revolver, some of which were accessible to A.G. In addition, the physical living conditions of the home were deemed " 'hazardous' " due to the presence of cockroaches, rats, and dog feces inside. The parents were arrested and charged with drug-related offenses. Mother was also charged with child cruelty. A.G. was taken to Polinksy Children's Center and, a few days later, placed with paternal uncle and paternal aunt (caregivers).

---

[2]     Father is not a party to this appeal.

[3]     The family had come to the Agency's attention on three occasions before the current case. In October 2017, the Agency received a referral alleging general neglect and caretaker absence/incapacity based on a report that Mother tested positive for methamphetamines and Father was also using drugs. The referral as to general neglect was closed as inconclusive and the allegation of caretaker absence/incapacity was closed as unfounded. In December 2017, public officials witnessed Father strike and shove Mother, which resulted in a referral of general neglect and emotional abuse of A.G. The allegation of general neglect was substantiated, while the allegation of emotional abuse was closed as inconclusive. Another referral was made that same month alleging general neglect due to alleged presence of marijuana in the parents' home, which was evaluated out.

A.    *Detention and Jurisdiction/Disposition Hearings*

On July 8, 2019, the Agency filed a dependency petition on behalf of A.G.  Pursuant to section 300, subdivision (b)(1), the Agency alleged there was a substantial risk A.G. would suffer serious physical harm or illness based on the inadequate and unsafe home environment discovered by the police.  At the detention hearing the next day, the juvenile court made a prima facie finding on the petition, removed A.G., and detained her in the home of an approved relative, noting that she was currently placed with caregivers.  The court ordered the Agency to provide the parents with voluntary services and ordered liberal, supervised visitation for Mother and Father.

At the contested jurisdiction and disposition hearing in September 2019, the court found clear and convincing evidence to support jurisdiction and declared A.G. a dependent.  At this time, the court found Mother's progress toward alleviating the protective issues to be "adequate" and Father's progress was "none."

B.    *Six-Month and 12-Month Reviews*

The six-month review hearing was originally scheduled for March 2020.  However, it was continued several times, in part due to the onset of the Covid-19 pandemic, and ultimately combined with the contested 12-month review hearing held in November 2020.

During this period, Mother had several supervised visits with A.G.  The caregivers reported that Mother was attentive and appropriate during the visits, that A.G. enjoyed the time with Mother and was "always excited" to see her.  These positive reports led the Agency to briefly lift the supervision of the visits, but the reports during this unsupervised period were less encouraging.  The caregivers reported that A.G. was returned to them unfed,

4

"dirty and messy," and with bug bites on her back. The parents were also often tardy picking her up, sometimes appearing hours late without notice.

Additionally, concerns about the parents' mental health, substance abuse, and inability to control their anger began to appear prominently in the Agency's reports.[4] At A.G.'s third birthday party in July 2020, Father became angry and belligerent, yelled at A.G. and other adults, pushed the paternal uncle, tried to push the paternal grandmother, and at one point raised his hand as if to hit Mother. Mother also became upset, screaming and yelling at family members. A.G. appeared afraid and made comments afterwards (" '[poor] mommy, daddy hit her' ") suggesting she had previously witnessed Father hitting Mother. In August 2020, Father kicked in the front door of the maternal grandfather's house, pulled out a pocket knife, and threatened to kill him. That same month, Mother was seen parked outside of a boxing class taken by the caregivers' son, glaring at him as he left the building. She drove away when paternal aunt arrived. As a result of these incidents, the Agency reverted the parents' visits with A.G. to supervised.

At the combined six-month and 12-month hearing in November 2020, the Agency conceded that reasonable services had not been offered for the 12-month review period but had been offered for the six-month review period. Thus, the court ordered that additional services be provided to the parents and scheduled the 18-month review hearing, which was later continued to March 2021 for a contested hearing.

---

[4]    Both parents have mental health diagnoses for which they have been prescribed medication. Mother's mental health issues were manageable with medication, medical evaluations, and support. In June 2020, however, she stopped attending a mental health program and stopped refilling her medication.

C.    *18-Month Review*

In the following months, Mother continued to visit A.G. often, and the visits were generally positive. A.G. eagerly waited to be picked up for the visits, was always happy to see Mother, hugged and kissed her, and "truly appear[ed] to love" Mother. Mother brought games and toys for A.G., talked and played with her, and sometimes read to her. Mother focused her attention on A.G. and told her she loves her. At the conclusion of the visits, A.G. would tell Mother that she loves her but would appear ready to leave.

Not all of Mother's visits with A.G. were positive, however. Sometimes after a visit, A.G. would tell the caregivers, "no more mommy and dada." She went home early from one visit crying because her parents were arguing and yelling. She would occasionally say that she does not want any more visits with her parents because she does not like to see them fight. She also asked the caregivers to wait in the car during visits until she knew what mood the parents were in, describing them as " 'good gummybears' " or " 'bad gummybears.' " The caregivers reported that at times A.G. "seem[ed] so exhausted" and "completely drained," and "want[ed] to be comforted" after the visits.[5]

At the 18-month review hearing in March 2021, the juvenile court found by clear and convincing evidence that reasonable services had been offered to the parents, but the parents made minimal progress toward alleviating or mitigating the causes necessitating placement. Accordingly,

---

[5]    By contrast, the Agency's reports described the caregivers' home as a "stable," "calm and relaxing environment" where A.G. is "very loved and doted on by the entire family." The Agency also reported that A.G. is "very close" to the caregivers and looked to them when she needed help and assurance.

the court terminated reunification services and scheduled a section 366.26 hearing for July 2021.

After reunification services were terminated, Mother continued to visit with A.G. regularly. A.G. played with the toys brought by Mother, shared snacks with her, and talked and sang with her. In one tender moment, A.G. said something to her parents, to which Mother responded, " 'We miss you too, we miss you and love you so much.' " During a June 2021 visit, Mother appeared ill due to the heat, and A.G. poured some water for Mother to drink. In July 2021, A.G. acted lovingly toward her parents, and Mother held and rocked her while telling her that she loved her. One time, A.G. appeared saddened at the memory of taking baths at the parents' home and rested her head on Mother's chest. When Mother began to cry, A.G. wiped her tears with a napkin. At another visit, A.G. ran to Mother shouting " 'mommy!' "

However, Mother's conduct sometimes distressed A.G. In August 2021, paternal aunt took A.G. to a scheduled visit but a monitor was not available so the visit could not proceed. Mother approached paternal aunt in the parking lot and began discussing the case. When paternal aunt indicated the case was proceeding towards adoption instead of guardianship, Mother became angry and started yelling at paternal aunt, calling her " 'a liar.' " A.G. was crying, so paternal aunt left to take her home, but then realized Mother had A.G.'s blanket. Paternal aunt returned and tried to get the blanket back, but Mother refused to give it to her. Both paternal aunt and A.G. tried to pull the blanket from Mother, but Mother continued to hold onto it and pull it back towards herself. Paternal aunt felt "foolish pulling the blanket back and forth" so she "gave up" and left with A.G. She reported that A.G. was scared and crying so hard she could not catch her breath. A.G.

referred to the parents as " 'ugly gummy bears' " and expressed that she was sad and scared.

## II.

### *Contested Section 366.26 Hearing*

The section 366.26 hearing was held on September 1, 2021. The social worker testified and the court received the Agency's section 366.26 and various addendum reports into evidence.

In its section 366.26 report, the Agency concluded A.G. was generally and specifically adoptable, as paternal uncle and aunt wanted to adopt A.G. The agency reported it was "evident" that A.G. "loves her parents, and that her parents love her. However, all of [A.G.'s] needs have been met by her current caregivers for a period of almost two years." The Agency noted that A.G. "appears to have a positive relationship with her caregivers, and is comforted by their presence."

In an addendum report, the Agency determined that A.G. "does not have a significant, positive, emotional attachment to her parents." In making that determination, the Agency considered A.G.'s young age; that the "smaller portion of [her] life [had been] spent in parental custody (23 months out of 49)"; "the minimal impact of interaction with her parents," including that A.G. does not show distress upon separation, she wanted her caregiver during multiple visits, and she showed visible distress after paternal aunt's altercation with Mother over the blanket; and that A.G.'s "particular needs are all being met by the caregivers," who "have been fulfilling the parental role for [A.G.] for over two years."

The social worker testified consistent with the Agency's reports. According to her, A.G. appeared to "generally enjoy seeing her parents" and the parents were "generally very affectionate with her." The social worker

8

observed that A.G. appeared uncomfortable during multiple visits. Her demeanor would change where she would become silent or nonresponsive to her parents and would ask to end the visits and return home with the caregivers. The caregivers had also reported to the social worker that A.G. said she was more comfortable with the visits when her paternal aunt was nearby or A.G. knew paternal aunt was coming to get her. A.G. also did not show distress when the visits ended.

The social worker opined that adoption, not guardianship as requested by the parents, was in A.G.'s best interest. She explained that guardianship did not provide A.G. with stability, because it "denote[d] that the parents would retain rights to visitation as well as a right to petition the [c]ourt later on in a change of circumstances." This would not be in A.G.'s best interest because "throughout this case[,] the parents have inconsistently participated in services, have lacked the insight into their actions and how those actions have impacted [A.G.]; have not engaged in . . . drug testing consistently; or, in addition, the father has tested positive for methamphetamines recently within the past couple of months." "[A]ll of this, in addition to the impulse control . . . with the several violent incidents that have taken place over the past year or so, lends to the idea that the parents' lack impulse control and insight and would continue to jeopardize [A.G.'s] stability." Thus, despite an "extensive period of reunification services," parents had failed to show they can mitigate the protective issues.

The social worker testified she had also determined that A.G. does not have "a significant positive emotional attachment" to her parents. She reached this conclusion based on observing A.G.'s behavior during visits with her parents and "her identification with the caregivers as her parental

9

figures." She also noted that during visits A.G. was "hesitant" to approach Father and that she does not seek out her parents for comfort.

Neither parent testified, but Mother submitted a letter to the juvenile court. In it, Mother took responsibility for her mistakes, conveyed lessons she learned through her participation in services, and asked for "another chance" to keep A.G. safe.

In its closing argument, the Agency asked the court to terminate parental rights to allow for adoption. The Agency asserted the parental-benefit exception to the preference for adoption did not apply because the parents' contacts with A.G. were more akin to a "friendly visitor." Counsel noted that, while some of the reports reflected pleasant interactions between A.G. and her parents, A.G. often asked that her caregiver attend visits and did not exhibit distress upon separating from her parents. In addition, the Agency argued several incidents that negatively impacted A.G., including the verbal altercation between Mother and the paternal aunt and the two incidents involving violence by Father, weighed against finding that there was a significant bond between A.G. and Mother that would outweigh the benefits of adoption.

Minor's counsel agreed with the Agency. Counsel noted that A.G. had spent more than half of her life with the caregivers, was bonded to them, and did not get upset when her visits with her parents ended. Counsel stated, "the relationship that [A.G.] has with both of her parents is more than just a friendly visitor[. W]e can tell from the visitation descriptions that were provided by the social worker, that she is excited to see her parents. She runs to them. She plays with them. There are really sweet moments they have together where [A.G.] will lay on her mother or lay on her father or cuddle with them and plays with them, and the parents do bring food and

10

snacks and toys to every single visit." But, continued counsel, "the parent-child bond requires more than just that. . . . It requires that they fill a strong parental role." She argued A.G. understood who her parents were, but that she looked to the paternal aunt, and not them, to fill that role. In addition, she noted the parents' protective issues continued to exist and that "there is still a lot of progress that needs to be made."

Mother's counsel countered that she *was* fulfilling the parental role, "which is the real test here." Mother would bring snacks, play games, play music, take A.G. to the restroom, "doing the things that every parent does for their child." Mother's counsel acknowledged that A.G. was more comfortable with the caregivers and looked to them for her needs, but asserted that was to be expected given the limited court-ordered visitation she had with A.G. Counsel argued Mother "has done her best to [be a mother], to actually play it out in person with the minor." Father's counsel also asserted that the parents were playing a parental role during the visits, and that they had taken care of A.G. without assistance on two different occasions, once where she almost choked and once where she fell.

Following arguments, the juvenile court found that the parental-benefit exception did not apply. The court stated:

> "[G]iven the evidence . . . the [c]ourt does find that there was regular and consistent visitation. That's not easy. I want to recognize that it takes -- given the parents' circumstances, it takes a lot of dedication, effort, sacrifice to make those visitations meaningful, to be prepared for those visitations, to think about how and what to bring and how to interact during the visitation. It takes work, it takes a care and a concern and a support for [A.G.], and I certainly want to recognize that and I want to give both parents credit for that.
>
> "I always say this in every case, that *time is the biggest enemy in this case*. And so throughout the course of this case [A.G.] is growing, she is getting bigger, she is developing all these

11

skills, and she is also becoming more and more her own person. She has her own little personality and I am sure both parents have noticed that as the time has gone by.

"What the law looks at and what the [c]ourt has to consider is based on what evidence is shown before this [c]ourt is, as her path in life moves forward and she starts with every day growing bigger and getting older and learning things and developing into her own person, both the mother and the father have their own paths in moving forward and becoming healthier and safer people, understanding themselves better, the kind of parents they want to be, how they want to interact with [A.G.], what they can provide and offer to her, and they're both growing and developing. It's clear, I have read this letter, and I have noticed that the mother has learned and shared with the [c]ourt as far as her insight and how she sees things.

"The key is, though, when we're talking about the bond and parent-child bond, so these three paths kind of have to intertwine, and that's the key here is the paths are moving forward and these visits and the contact that the parents are making with [A.G.], they are healthy and they appear to be for the most part mostly positive. But the contact and the connection with the parents have to intertwine, almost like a braid to make [A.G.] even stronger, right? That's the point of the understanding of parent support and being there. That's each parent separate and apart to intertwine into that kind of braid for a stronger, healthier [A.G.]

"At this point, the [c]ourt sees based on the evidence that the paths are moving forward, time is going forward, and *there is only so much time that the law affords for this type of situation*. Those paths have not intertwined to the sense where if we were to do adoption, unraveling that braid would be harmful or detrimental to [A.G.] *In fact, the [c]ourt finds that there is still a lot of growth that needs to happen. There is still a lot of discovering and insight that needs to be done with both parents as far as the health, safety, well-being of [A.G.]* And although the visits are consistent and they're loving and they're supportive, just the insight that the mother has provided in her own letter, in addition to the behaviors and the evidence provided in each of the reports, *[A.G.] does look to her caregiver for all her specific needs for care and support*. She does enjoy the time she spends with

12

her parents, but of course there have been incidents where she has been concerned and she references them as good or bad gummie bears.

"At the same time, also, what's been kind of clear is that I am trying to understand, mother and father, they each have their own separate paths, and hopefully the goal was to intertwine them to a point where they are connected so much with [A.G.] But it does appear from the evidence that the mother has been trying very, very hard to kind of reach some type of balance. And it does appear since the inception of the case, frankly, that she is going back and forth and trying to please so many people, including the father and engage the father, and it does appear that *there are issues too that the father is needing to address as far as sobriety and the kind of healthy and safe person* he wants to be to be the healthy and safe parent he can be for [A.G.] [¶] And the *mother has begun to recognize insight as to kind of where she wants her growth to be, but it hasn't gotten to the point where she understands what she needs to do for [A.G.] as a mother.* It looks like she is between a rock and a hard place and trying to please so many people that at some point there hasn't been enough to elevate the visitation or the contact to the point where things have intertwined and connected to [A.G.] and the point where that would require something less than adoption.

"So for those reasons, I will adopt the recommendations set forth in the social worker's report." (Italics added.)

The juvenile court then found by clear and convincing evidence that A.G. will likely be adopted if parental rights are terminated and that it was in A.G.'s best interest to be adopted. Accordingly, the court terminated parental rights and selected adoption as the permanent plan for A.G. Mother timely appealed.

## DISCUSSION

### I.

### *The Parental-Benefit Exception*

Mother contends the juvenile court applied an incorrect legal standard in determining the parental-benefit exception to adoption did not apply.

13

Specifically, she contends the court improperly focused on whether Mother had overcome the protective issues that led to dependency and held a parental role, factors which have been disapproved by the California Supreme Court in *Caden C.* On the record before us, we are unable to conclude that the court conducted the proper analysis of the second and third elements of the legal standard set forth in *Caden C.*, namely whether the child would benefit from continuing the parental relationship and whether terminating that relationship would be detrimental to the child. We are therefore compelled to reverse the juvenile court's order terminating parental rights and to remand the matter for another section 366.26 hearing, with instructions to the court to consider these factors as set forth in *Caden C.*

A. *Legal Principles*

When the juvenile court sets a section 366.26 hearing, it has already terminated reunification services and determined the dependent child cannot safely return to a parent's custody. (*Caden C.*, *supra*, 11 Cal.5th at p. 630; *In re Marilyn H.* (1993) 5 Cal.4th 295, 304; § 366.26, subd. (b)(1).) There is now an "assumption . . . that the problems that led to the court taking jurisdiction have not been resolved" and, thus, "the question before the court [at the section 366.26 hearing] is decidedly not whether the parent may resume custody of the child." (*Caden C.*, at p. 630.) Indeed, it is no longer permissible to order reunification at this juncture. (*Ibid.*, citing *In re Zeth S.* (2003) 31 Cal.4th 396, 411.) Instead, the focus of the dependency process changes from reunification services to the child's need for permanency and stability and the court is to select and implement a permanent plan for the child. (See *Marilyn H.*, at p. 304; *In re Celine R.* (2003) 31 Cal.4th 45, 52–53 (*Celine R.*) [The section 366.26 hearing is "designed to protect children's

14

'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' "].)

At the section 366.26 hearing, the court has three permanent placement options: adoption, guardianship, or long-term foster care. (§ 366.26, subd. (b).) Of these options, "[a]doption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) While legal guardianship or long-term foster care leaves parental rights in place, adoption "requires terminating the natural parents' legal rights to the child." (*Id.* at p. 574.)

"Even when a court proceeds to select [adoption as] a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception. What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. [Citations.] The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 629–630, citing § 366.26, subd. (c)(1)(B)(i).)

Pursuant to section 366.26, the juvenile court must first determine by clear and convincing evidence whether the child is likely to be adopted and, if it does, "then the court shall terminate parental rights to allow for adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) "But if the parent shows that

termination would be detrimental to the child [due to the parental-benefit exception], the court should decline to terminate parental rights and select another permanent plan.  (See § 366.26, subd. (c)(1)(B)(i)–(iv), (4)(A).)."  (*Id.* at pp. 630–631.)  "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption."  (*Celine R.*, *supra*, 31 Cal.4th at p. 53.)

The first element of the parent's burden in establishing the parental-benefit exception—regular visitation and contact—is "straightforward" and "[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' "  (*Caden C.*, *supra*, 11 Cal.5th at p. 632; § 366.26, subd. (c)(1)(B)(i).)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' "  (*Caden C.*, *supra*, 11 Cal.5th at p. 632, citing § 366.26, subd. (c)(1)(B)(i).)  "[T]he relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' "  (*Caden C.*, at p. 632, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)  With the focus on the child, "courts often consider how children feel about, interact with, look to, or talk about their parents."  (*Caden C.*, at p. 632.)  Recognizing that "rarely do '[p]arent-child relationships' conform to an entirely consistent pattern," our Supreme Court has stated that "it is not necessary — even if it were possible — to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' "  (*Ibid.*)

"Concerning the third element — whether 'termination would be detrimental to the child due to' the relationship — the court must decide

16

whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633, citing § 366.26, subds. (c)(1)(B) and (c)(1)(D).) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship — in effect, *what life would be like for the child in an adoptive home without the parent in the child's life*." (*Caden C.*, at p. 633, italics added.) Thus, " '[i]f severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights." (*Ibid.*)

This third element—whether termination of parental rights would be detrimental to the child—is the most difficult question for the juvenile court to resolve. Where the court has found that regular contact and visitation have continued, and that this contact has created a relationship that benefits the child, the court must "decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 632, citing *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) As the Supreme Court stated, determining the "harm associated with severing the relationship is a subtle enterprise." (*Caden C.*, at p. 634.) A parent-child relationship sometimes "involves tangled benefits and burdens" and "[i]n those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Ibid.*)

17

The Supreme Court in *Caden C.*, therefore, provided guidance on the factors a juvenile court may and, importantly in the instant case, may *not* consider in deciding whether termination of parental rights would be detrimental to a child. First, it is improper to compare a "parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)" when weighing whether termination would be detrimental to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Because "[n]othing that happens at the section 366.26 hearing allows the child to return to live with the parent," a court "should not look to whether the parent can provide a home for the child." (*Ibid.*) The hearing "is decidedly not a contest of who would be the better custodial caregiver." (*Ibid.*) Rather, "the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Ibid.*) "Even where it may never make sense to permit the child to live with the parent, termination may be detrimental." (*Ibid.*)

Second, a parent's "continued struggles" with the issues that led to dependency cannot, "standing alone," be a bar to the parental-benefit exception as such a rule "would effectively write the exception out of the statute." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) Because reunification services have been terminated when the court sets the section 366.26 hearing, "it all but presupposes [when it holds the hearing] that the parent has not been successful in maintaining the reunification plan meant to address the problems leading to dependency." (*Caden C.,* at p. 637.) Noting that "[t]he parental-benefit exception can therefore only apply when the parent has presumptively *not* made sufficient progress in addressing the problems that led to dependency," the Supreme Court "reject[ed] the paradoxical proposition . . . that the exception can only apply when the

18

parent *has* made sufficient progress in addressing the problems that led to dependency." (*Ibid.*)  In demonstrating detriment, "[p]arents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception." (*Id.* at p. 637 & fn. 6 [disapproving a line of cases that held to the contrary].)

However, a parent's struggles with the issues that led to dependency "often prove relevant to the application of the [parental-benefit] exception" because it "may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.)  But a parent's struggles "are relevant only to the extent they inform the specific questions before the court:  would the child benefit from continuing the relationship and be harmed, on balance, by losing it? The parent's continuing difficulty with mental health or substance abuse may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent." (*Id.* at p. 638.)  "Nor could a parent's struggles be relevant simply because they might conceivably affect the parent's ability to regain custody of the child," because return to the parent's custody is not an option at the section 366.26 hearing.  (*Ibid.*)  "A parent's struggles may be most directly relevant . . . to the ' "positive" or "negative" effect of interaction between parent and child' (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576) and then somewhat more indirectly to the harm of removing such interactions from the child's life." (*Id.* at p. 639.)

B.     *Analysis*

We apply the substantial evidence standard in reviewing the court's findings on the first two elements—whether the parent has consistently visited and maintained contact with the child and whether the relationship is

19

such that the child would benefit from continuing it. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) We review the court's findings as to the third element, whether there is detriment to the child in severing the relationship, for abuse of discretion. (*Id.* at pp. 639–641.) As the Court in *Caden C.* explained, as to the third element, "the [trial] court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. . . . The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision — whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent — is discretionary and properly reviewed for abuse of discretion." (*Id.* at p. 640.) A juvenile court abuses its discretion when it applies an incorrect legal standard. (*In re Shannon M.* (2013) 221 Cal.App.4th 282, 289.)

Here, on the record before us, we are unable to conclude that the juvenile court applied the correct legal standard in determining the parental-benefit exception did not apply. In making its ruling, the court placed significant emphasis on Mother's continued struggles with the issues that led to dependency, a factor that our high court recently clarified is not dispositive. (*Caden C., supra,* 11 Cal.5th at pp. 637–838.) Further, rather than expressly discussing whether A.G. would benefit from continuing the relationship with Mother, and whether termination of that relationship would be detrimental to A.G., the court employed an analogy regarding a braid created by intertwined paths. We acknowledge that the court likely used the analogy in a sincere effort to explain seemingly complex legal principles to the parents. However, the analogy is fairly complex itself, and leaves us unable to determine whether the court applied the correct legal

20

standard. Further, the court's comments as a whole strongly suggest the court was focused more on whether the parents had a typical parental relationship with A.G., as opposed to considering whether A.G. would benefit from continuing the relationship that they did have.

First, we note that the juvenile court repeatedly focused on time as a factor. The court stated, "time is the biggest enemy in this case," "time is going forward, and there is only so much time that the law affords for this type of situation." While it is true that parents are only afforded a limited amount of time to reunify (*Celine R.*, *supra*, 31 Cal.4th at p. 52), the parent-child relationship often pre-dates the juvenile dependency proceeding, as it did here, and that relationship may be beneficial to the child regardless of the length of the dependency proceedings. Moreover, as we have explained, "the question before the court [at the section 366.26 hearing] is decidedly not whether the parent may resume custody of the child." (*Caden C.*, *supra,* 11 Cal.5th at p. 630.) Instead, the court must choose the most appropriate permanent placement option for the child and, in doing so, must consider whether severing the pre-existing parent-child relationship would be so detrimental to the child as to outweigh the presumptive benefits of adoption. (*Id.* at pp. 630, 632.)

Here, it seems the juvenile court was more concerned with Mother's continued struggles with the issues that led to dependency than the beneficial nature of her relationship with A.G. It placed significant emphasis on Mother's failure to make herself "healthier and safer" in order to be "the kind of parent[] [she] want[s] to be." But as our high court recently clarified in *Caden C.*, a parent's continued struggles with the issues leading to dependency cannot serve as a categorical bar to the parental-benefit exception. (See *Caden C.*, *supra*, 11 Cal.5th at p. 637.) As the Court

21

observed, "when the court holds a section 366.26 hearing, it all but presupposes that the parent has not been successful in maintaining the reunification plan meant to address the problems leading to dependency." (*Ibid.*) Accordingly, "[p]arents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan'" and "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception." (*Ibid.*) "Instead, the focus is whether there is a substantial, positive emotional attachment between the parent and child." (*In re D.M.* (2021) 71 Cal.App.5th 261, 270.)

This is not to say that a parent's struggles are never relevant at the section 366.26 hearing. "A parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) Thus, "a parent who gains greater understanding of herself and her children's needs through treatment may be in a better position to ensure that her interactions with the children have a ' "positive" . . . effect' on them." (*Id.* at pp. 637–638.) "[T]he parent's struggles speak to the benefit (or lack thereof) of continuing the relationship and are relevant to that extent. And issues such as those leading to dependency may also be relevant to the detriment from terminating parental rights." (*Id.* at p. 638.) There was evidence in the record that the parents' protective issues did have an adverse impact on A.G., but, here, the juvenile court did not directly connect its discussion of Mother's need to gain insight into her struggles to the impact of those struggles on A.G. or the parent-child bond.

It appears the juvenile court may have been attempting to do so with the braid analogy, but, unfortunately, the court did not clearly explain how

the analogy related to the legal questions before it. Thus, it is impossible for this court to determine whether the juvenile court applied the correct legal standards, whether A.G. would benefit from continuing the relationship with Mother and to what extent termination of that relationship would be detrimental to her. The court did state, "[t]hose paths have not intertwined to the sense where if we were to do adoption, unraveling that braid would be harmful or detrimental to [A.G.]" However, it is not clear what "unraveling that braid" means in this context, particularly since the court was discussing not just the parent-child relationship, but the "intertwined" paths between Mother, Father, and A.G. Beyond this one statement, the court did not directly address the beneficial nature of the relationship between Mother and A.G., or the extent to which severing that relationship would be detrimental to A.G. The court did make a passing reference to the "loving" and "supportive" nature of A.G.'s visits with both Mother and Father, but it did not directly address how A.G. "feel[s] about, interact[s] with, look[s] to, [and] talk[s] about" Mother. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

Moreover, the totality of the juvenile court's comments, including the braid analogy, suggest the court was focused more on whether the Mother, Father, and A.G. had a typical familial relationship, and not whether the relationship Mother had with A.G. was beneficial to A.G. In examining the nature of the parent-child relationship, "courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "Certainly, it is not necessary — even if it were possible — to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.'" (*Ibid.*) This is

23

particularly true where, as here, the parents have only limited, supervised time with the child.

In addition, the juvenile court seemed to compare the parents to A.G.'s caregivers, noting that A.G. turned to the caregivers to meet her "specific needs for care and support." "But such evidence does not preclude a finding [A.G.] had a significant positive attachment to mother. In proving the existence of a beneficial relationship, mother was not required to prove that [A.G.]'s attachment to her was [A.G.'s] primary bond." (*In re J.D.* (2021) 69 Cal.App.5th 594, 620.) The question before the court was whether A.G. had a beneficial relationship with *Mother*; "the section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver." (*Caden C., supra,* 11 Cal.5th at p. 634.) By focusing on Mother's progress and comparing her to the caregivers, it appears that the juvenile court did not adequately consider the relevant factors as set forth in *Caden C.* before terminating Mother's parental rights.

We note that the juvenile court's comments may have been, in part, influenced by the arguments presented by counsel, which also alluded to factors disapproved in *Caden C.* and failed to adequately address A.G.'s emotional attachment to Mother. For example, the Agency argued that the second element was not met because Mother was more of a "friendly visitor," and that A.G. is bonded to her caregivers, whom she relies on for her daily needs. In sum, considering the totality of the juvenile court's comments on the record, we cannot say with certainty that the court applied the correct legal standard. The court's comments seem to be focused primarily on the parents' continued struggles with the issues that led to dependency, a factor disapproved in *Caden C.*, and it is not clear from the analogy the court employed that it fully considered the nature of the relationship A.G. did have

24

with Mother. Specifically, we cannot say that the juvenile court adequately examined how Mother's continued struggles impacted A.G.'s relationship with her or whether there was a significant, positive, emotional attachment between them, such that severing the relationship would outweigh the benefits of adoption. (See *In re B.D.* (2021) 66 Cal.App.5th 1218, 1227–1228, 1231 [reversing on similar grounds].)

Finally, we cannot conclude that the juvenile court's failure to apply the correct legal standard was harmless. As a general rule, appellate courts apply a harmless error analysis in juvenile dependency proceedings. (*Celine R., supra*, 31 Cal.4th at pp. 59–60 [dependency court order should not be set aside unless it is reasonably probable the result would have been more favorable to the appealing party but for the error].) Under certain circumstances, though, the appellate court will reverse because it cannot properly determine whether the error was harmless by virtue of the impact upon the record of the order being considered. (See, e.g., *In re T.S.* (2020) 52 Cal.App.5th 503, 518; *In re Armando L.* (2016) 1 Cal.App.5th 606, 620–621.)

We are faced with such a situation here. We are unable to determine from the record before us how the juvenile court would have analyzed the second element had it employed the correct legal standard and focused on the exception from the perspective of the child. For similar reasons, we are unable to determine whether the juvenile court abused its discretion in concluding the detriment caused by severing that relationship would not outweigh the benefits of adoption to A.G. We will therefore remand so that the court may conduct the proper analysis in the first instance.[6]

---

[6] For this reason, we need not and do not decide Mother's additional contention that substantial evidence fails to support the juvenile court's

25

## II.

### *The Indian Child Welfare Act*

Mother also contends reversal is required because the Agency failed to comply with the inquiry requirements under ICWA. We agree and, on remand, the Agency shall conduct further inquiry consistent with ICWA.

A. *ICWA Inquiries*

Father denied any Native American ancestry.

Mother also initially denied any Native American ancestry during her initial interview with the Agency on July 3, 2019. On her Parental Notification of Indian Status (ICWA-020) form, Mother reported she may have Indian ancestry and identified the Shoshone tribe. At the detention hearing on July 9, 2019, the juvenile court inquired of Mother regarding her Native American ancestry. Mother disclosed she was adopted and learned from her biological sister she may be Shoshone and Aztec,[7] but did not know if her great-grandparents were registered. Although she stated she did not "know too much," she also stated, "*I do know that I am Native American.*" (Italics added.) She disclosed her biological sister's full name and that she lives in Las Vegas. Mother did not have a telephone number for her sister and explained she had found her sister "through Facebook" and had "messaged her." The court asked Mother to "maybe . . . get a little more

---

finding the parental-benefit exception inapplicable. We also express no opinion as to whether Mother can satisfy the second or third elements.

[7]     ICWA does not apply to the Aztec tribe as it is not a federally recognized Indian tribe. (25 U.S.C. § 1903, subd. (8) [defining " 'Indian tribe' " to mean "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians . . ."]; § 224.1, subd. (a).)

information" on how to contact her sister and "let her know" the Agency would be contacting her for information.

On July 19, 2019, the Agency reported that Mother disclosed she possibly had Shoshone ancestry through her deceased biological mother, O.N. It noted that Mother had been unable to provide the Agency with any further identifying information for her biological parents or any contact information for a relative with such information. There is nothing in the record to indicate Mother followed up with her sister in Las Vegas through Facebook or otherwise, or that the Agency made any attempt to independently obtain further information about that sister despite having her full name. The Agency contacted Mother again on July 26, 2019. The Agency reported that it will continue to follow up with Mother and "any other relatives that are available for inquiry."

At the jurisdiction and disposition hearing on July 30, 2019, the Agency's counsel informed the juvenile court that Mother's claim regarding Native American ancestry was still be investigated but had not gone far because of a lack of information. The Agency acknowledged based on current information it had, there was reason to believe A.G. may be an Indian child. Based on the Agency's intention to conduct further investigation, the juvenile court again deferred its ICWA finding.

At the contested jurisdiction and disposition hearing in September 2019, the Agency requested the juvenile court to find that there was no reason to know A.G. was an Indian child. Counsel explained Mother had indicated she was adopted when she was 18 months old, her biological mother "could have possibly had Shoshone heritage," and Mother was ordered to provide further information to the social worker. Counsel contended: "At this point that's all of the information that the Agency has

27

been provided with is that there is some possibility of some distant Shoshone heritage, but that is not enough to know this child is an Indian child. There is no evidence that the mother is a member of that tribe, that she received tribal benefits, or anything else." The juvenile court asked if there was any objection to the court making the requested finding. Although the reporter's transcript did not record any audible response, the minute order states there was no objection. Accordingly, the court found there was no reason to know that A.G. is an Indian child.

B.      *Legal Principles*

"ICWA is a federal law giving Indian tribes concurrent jurisdiction over state court child custody proceedings that involve Indian children living off of a reservation. (25 U.S.C. § 1911(b)-(c); *Mississippi [Band of Choctaw Indians] v. Holyfield* (1989) 490 U.S. 30, 36 [(*Choctaw Indians*)].) Congress enacted ICWA to further the federal policy ' "that, where possible, an Indian child should remain in the Indian community[.]" ' ([*Choctaw Indians, at p. 37.*])" (*In re W.B.* (2012) 55 Cal.4th 30, 48, fn. omitted.) Thus, in any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child," any parent or Indian custodian and the Indian child's tribe have the right to intervene (25 U.S.C. § 1911, subd. (c)), and may petition the court to invalidate any foster care placement of an Indian child made in violation of the ICWA (25 U.S.C. § 1914; see also § 224, subd. (e)).

The juvenile court and county child welfare department "have an affirmative and continuing duty to inquire whether a child," who is the subject of a juvenile dependency petition, "is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9; Cal. Rules of Court, rule 5.481(a).) "This continuing duty can be divided into three phases:

the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.* (2020) 55 Cal.App.5th 558, 566.)

"The *duty to inquire* whether a child is an Indian child begins with 'the initial contact,' i.e., when the referring party reports child abuse or neglect that jumpstarts [the Agency's] investigation. (§ 224.2, subd. (a).) [The Agency's] initial duty to inquire includes asking the child, parents, legal guardian, extended family members, and others who have an interest in the child whether the child is, or may be, an Indian child. (*Id.*, subd. (b).) Similarly, the juvenile court must inquire at each parent's *first* appearance whether he or she 'knows or has reason to know that the child is an Indian child.' (*Id.*, subd. (c).) The juvenile court must also require each parent to complete Judicial Council form ICWA-020, Parental Notification of Indian Status. (Cal. Rules of Court, rule 5.481(a)(2)(C).) The parties are instructed to inform the court 'if they subsequently receive information that provides reason to know the child is an Indian child.' (25 C.F.R. § 23.107(a) (2020); § 224.2, subd. (c).)" (*In re D.F.*, *supra*, 55 Cal.App.5th at p. 566, fn. omitted.)

Relevant here, if the juvenile court or social worker "has reason to believe[8] that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know[9] that the

---

8  "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated" in section 224.2, subdivision (d)(1)-(6). (§ 224.2, subd. (e)(1).)

9  "There is reason to know a child involved in a proceeding is an Indian child under any of the following circumstances: [¶] (1) A person having an

29

child is an Indian child, the court [or] social worker . . . *shall* make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable." (§ 224.2, subd. (e), italics added.) When there is reason to believe the child is an Indian child, the further inquiry mandated by section 224.2, subdivision (e), "includes, but is not limited to": (1) interviewing the parents, Indian custodian, and extended family members[10], to gather biographical information regarding the child; (2) contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying tribes in which the child may be a member or eligible for membership; and (3) contacting the tribe and any other person who may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility for membership. (§ 224.2, subd. (e)(2)(A)-(C).)

C. *Analysis*

Here, the Agency agreed there was reason to believe A.G. may be an Indian child, based on Mother's claim she had Native American ancestry,

---

interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child. [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village. [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child. [¶] (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child. [¶] (5) The court is informed that the child is or has been a ward of a tribal court. [¶] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d).)

10    "[E]xtended family members" are defined to include a child's grandparents, aunt, and uncle.  (§ 224.2, subd. (b); 25 U.S.C. § 1903(2).)

possibly from the Shoshone tribe. That fact triggered the Agency's mandatory duty to make further inquiry regarding A.G.'s possible Indian status (§ 224.2, subd. (e)), which further inquiry includes interviewing "extended family members" and contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying tribes in which the child may be a member or eligible for membership (§ 224.2, subd. (e)(2)(A)-(C)).

At the July 30, 2019 jurisdiction and disposition hearing, the Agency acknowledged its duty to further investigate Mother's claim of Native American ancestry, including following up with "any other relatives that are available for inquiry," and stated that it intended to conduct further investigation. However, from our review of the record, it appears the Agency did not take any further action between July 30, 2019 and September 3, 2019, when it declared there was "no evidence that the mother is a member of [the Shoshone] tribe" and asked the juvenile court to find there was no reason to know A.G. was an Indian child.

Although the Agency had contact with several relatives during the proceedings, there is no indication the Agency inquired with these relatives about A.G.'s possible Indian ancestry. For example, the Agency spoke with adoptive maternal grandfather on several occasions in July 2019, August 2020, and December 2020. Adoptive maternal grandfather informed the Agency that he and his wife adopted Mother when she was 18 months old after her biological parents died and her biological grandmother was unable to care for her. The Agency was also in regular contact with paternal uncle and paternal aunt with whom A.G. had been placed since July 5, 2019, but neither were asked about A.G.'s possible Indian ancestry. Moreover, although the Agency had the full names of Mother's biological parents and

31

biological grandmother, it never made any attempts to contact the Bureau of Indian Affairs to determine whether any of these maternal relatives were registered or members in any of the 12 federally recognized Shoshone tribes.

Because we conclude the Agency did not comply with its obligations under ICWA, we conclude the juvenile court's ICWA finding is not supported by substantial evidence and reverse on this additional ground. On remand, the Agency shall conduct further inquiry as mandated by section 224.2, subdivision (e).

## DISPOSITION

The order of the juvenile court is reversed and remanded for further proceedings consistent with this opinion. The remittitur shall issue on or after 60 days after the filing date of this opinion unless the parties stipulate in writing to the earlier issuance of the remittitur. (Cal. Rules of Court, rules 8.264(b)(1), 8.272(a), (c)(1).) At the new section 366.26 hearing, the parties may consider any circumstances that have arisen since the juvenile court's September 2021 order.

DO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.

32